## Lester v. The Century Indemnity Company

*David S. Malis*, for plaintiff.
*Frank R. Ambler*, for defendant.

LEWIS, J., February 19, 1948.—Plaintiff, Lester, a corporation, during the period involved in this litigation, conducted a retail clothing and accessory store in Camden, N. J. The building had a 30-foot frontage, a depth of approximately 92 feet, and included two sales floors, a basement, and one floor containing offices and tailoring shop. There was one entrance, at the front.

On October 28, 1940, defendant, The Century Indemnity Company, issued to plaintiff one of its policies indemnifying against loss by burglary. The policy

was known as a mercantile open stock burglary coverage, and was for the term of three years. While this policy was in force, plaintiff corporation orally and by letter dated December 3, 1942, requested defendant to provide additional coverage to indemnify plaintiff against loss resulting from any one secreting himself inside plaintiff's building during business hours and departing with merchandise after closing hours.

Defendant's general agent, Emanuel W. Wirkman, Incorporated, to whom plaintiff's letter had been addressed, replied under date of December 8, 1942, that under plaintiff's burglary policy as then written, there would be no coverage for the type of loss referred to, but that "we have arranged for a binder, which is now in effect, and as the cost for the additional protection is considerable, we thought it best to advise you before endorsing the policy." The letter went on to explain that the additional premium for the added coverage feature would be $145.63, but that the general agent was attempting to obtain a reduction of the rate.

Under date of April 29, 1943, defendant's general agent wrote to plaintiff another letter which included the following reference to the binder for the additional coverage: "We have not received final word from the Company concerning the theft coverage which we have been binding, but as soon as we are advised, we will close out that matter."

By interim conversations, plaintiff had been assured that the binder was in full effect, and the issuance of the endorsement to be attached to the original policy was delayed only by the general agent's efforts to obtain an advantageous adjustment of rates, to result from the granting of what was termed an "equity rating", as a preferred risk.

Plaintiff maintained an open account with defendant's general agent, paying bills for premiums when rendered. It was agreed by the parties that the rate quoted by the general agent for the added coverage

insured by the binder, to wit, $145.63, represented the full rate or charge then in effect under the insurance laws of the Commonwealth of Pennsylvania for what was styled a "mercantile open stock theft endorsement", and that the risk covered by such an endorsement was not limited to thefts perpetrated by persons who might secrete themselves in the insured's place of business and commit thefts after closing hours. In other words, the rate quoted was for a mercantile open stock theft endorsement in its customary form, as approved by the Insurance Department of Pennsylvania, and by the National Bureau of Casualty and Surety Underwriters, of which defendant insurer was a member, and to whose rates defendant had agreed to conform. There was no other approved endorsement or binder for a mercantile open stock theft risk carrying a premium rate of $145.63.

I have no difficulty in concluding from all the evidence that defendant undertook to issue to plaintiff a mercantile open stock theft endorsement in the usual form then in use, for which the premium rate then prevailing was the sum quoted to plaintiff, and agreed to by plaintiff—$145.63. While plaintiff had asked for less, it had been supplied with the more comprehensive coverage, for which it had undertaken to pay, and plaintiff thereby became entitled to the full protection of that form of endorsement which the agreed premium would purchase. Defendant or its general agency must have made some written record of the kind and scope of the coverage included in the binder, but no such writing was offered in evidence, and we may assume that self-interest led to this concealment.

Some question was casually raised during the trial as to the agreement being a New Jersey rather than a Pennsylvania contract, and as to the application of the no-discrimination provisions of the insurance laws of Pennsylvania to the transaction. This point was not adequately raised in the pleadings, nor seriously

pressed at the trial, and we shall dismiss it with the statement that the contract was quite apparently made in Pennsylvania through defendant's general agent, which had full authority to contract for defendant in the circumstances, notwithstanding the risk was located in Camden, New Jersey.

It remains to be determined whether a loss due to theft has been adequately shown by the evidence, and if so, the extent of that loss. Plaintiff offered proof that its retail store had been visited on at least 17 occasions between January 23, 1943, and April 24, 1943, by a man giving the name of Risko or Roski, but who was really one Thevenny, a professional thief, with a record of 30 or more arrests prior to 1943 and an aggregate total of arrests, as of 1946, of 42; that Thevenny made purchases of small items and always paid cash; that none of his purchases included suits of clothes or coats or dresses. It was further shown that plaintiff was summoned by the Detective Bureau of Philadelphia early in June 1943, and upon responding, plaintiff's representatives were shown suits of clothes carrying plaintiff's labels and in an untailored or unfinished condition, evidencing that they had not been sold by plaintiff but had been taken from its establishment illegitimately; that this merchandise was traced to the Thevenny "gang", who had apparently committed many similar thefts from retail clothing stores, including two operated by Browning, King & Company, in the Philadelphia area.

In the meantime, however, plaintiff, having become dissatisfied with the Wirkman Agency, and desiring to transfer its insurance elsewhere, had caused its burglary policy and the theft binder issued by defendant to be cancelled as of May 1, 1943. Plaintiff was required by the terms of that insurance coverage to substantiate any claim for loss by proof of robbery, theft or larceny, and also to deduct from any loss claimed an amount equal to the average shortage of

merchandise in plaintiff's establishment revealed in the last five annual physical inventories. Plaintiff thereupon caused an inventory to be made of its stock as of June 30, 1943. The last previous inventory had been taken as of December 31, 1942. The June 30, 1943 inventory, plaintiff contends, showed a net loss of 271 suits of men's clothing, 5 men's coats, 46 women's dresses, 17 ladies' coats, 14 fur garments and 32 articles of jewelry, having an aggregate cost value of $5,413.07, after crediting $929.84, representing the average shortage for the period ascertained in accordance with the terms of the insurance. It is this sum that plaintiff now seeks to recover.

It will thus be seen that no inventory was taken until June 30, 1943, and as the insurance coverage had been cancelled as of May 1, 1943, there had elapsed a period of two months during which defendant was under no obligation of indemnity to plaintiff. Plaintiff, however, contends that it more than complied with the terms of its insurance contract in causing an inventory to be taken six months subsequent to the inventory of December 31, 1942, whereas the policy required it only to take inventory once yearly. The burden, of course, was on plaintiff to "reasonably show" that the loss claimed for had been occasioned by robbery, theft or larceny during the effective life of the binder, which ended on May 1st. We have given most careful consideration to all of the evidence relating to the circumstances of the loss and the amount thereof, and conclude that plaintiff has met the burden with respect to the cause of its loss, as being due to theft.

Regarding the amount of loss sustained during the life of the binder, I am unable to reasonably conclude from the evidence that all of the merchandise claimed for was stolen prior to May 1, 1943. It is impossible for any tribunal to determine with any certainty either the time or the amount of plaintiff's losses due to theft.

Jury or judge can only approximate, and this entirely from circumstantial evidence. A reasonably just result will have been reached if plaintiff is awarded indemnity to the extent of $3,000, to which interest will be added from May 1, 1943, or a total of $3,870. Before so concluding, I have carefully considered the evidence elicited on cross-examination of plaintiff's witnesses with reference to the manner of the taking of the inventory, and the utter inability of the witnesses who prepared the inventory to determine what, if any, portion of the merchandise disappeared subsequent to May 1, 1943. Plaintiff did offer evidence, however, to the effect that following June 30, 1943, the inventory shortages of plaintiff reverted to the normal percentage of loss that had been sustained prior to the six-month period that included Thevenny's visits to its store.

I find for plaintiff in the sum of $3,870.